Thank you, Your Honors, and may it please the Court. Gregory Garr on behalf of the Appellant FMC Corporation. This case involves a challenge to the enforceability of a tribal court judgment that imposes a $1.5 million annual fee on the Appellant FMC in perpetuity or for as long as the waste at issue in this case remains on FMC's site, but which under the EPA-approved and Ninth Circuit-approved remediation plan devised for that waste will be for decades, if not centuries. That judgment cannot be enforced by the federal courts for two independent reasons. First, the tribes lacked jurisdiction to impose the fees and enter the judgment at issue. And second, FMC was deprived the minimum protections of due process in the tribal court proceedings that resulted in that judgment. I'd like to begin with the jurisdictional issue. The Supreme Court and this Court have repeatedly made clear that tribal jurisdiction over nonmembers for conduct or use on non-Indian fee land is extremely limited for three fundamental reasons that jurisdiction did not exist in this case. First, any agreement that is the product of a regulatory process cannot, as a matter of law, establish the kind of consensual commercial relationship that the Supreme Court has repeatedly held is required to invoke the first exception under Montana. Second, waste that is the subject of an EPA-approved remediation plan that this Court itself has held is protective of human health and the environment cannot, as a matter of law, establish the kind of existential threat that the Supreme Court has held is required to invoke the second Montana exception. And third, even if there were some basis to find some jurisdiction of some kind, the imposition of a $1.5 million annual permit fee is the epitome of the kind of in-for-a-penny, in-for-a-pound analysis that the Supreme Court has categorically rejected. Did the operation of FMC's processing plant, if I'm accurately describing it, on its fee land but within the exterior boundaries of the Shoshone require an agreement between FMC and the tribe? It didn't require agreement, Your Honor. There was an employment relationship. There were mineral leases pertaining to the mining of phosphorus onto the tribe's lands, but the tribe's jurisdiction to go on to FMC. I'm not at jurisdiction yet. I'm asking about the nature of the relationship in good times, when your client was operating the phosphorus plant and the tribe had said okay and was receiving payments from your client. Was that the result of a contractual relationship? No, Your Honor. They weren't receiving payments pursuant to the alleged agreement in this case. There were employment relationships, and there was, you know, an effort, certainly an effort to get along. Any of those in writing? There weren't payments under agreements in place at that time. But that relationship, Your Honor, one could think of as a commercial relationship, whereas here the relationship at issue is purely regulatory. The tribe's attempts to come to FMC to demand permits for FMC's storage, disposal of waste on its property, and that's fundamentally different than the kind of consensual commercial relationship that the Supreme Court recognized in Montana. And that's the fundamental legal problem with the jurisdictional assertion in this case. I'm not sure I fully understood yet your answer to Judge Hawkins' question during, probably a good way to say it, during the good times. Yeah. What sorts of contractual relationships existed between your client and the tribe? Well, there were employment relationships with individual tribal members. Any other contractual relationships? There were leases dealing with the mining of phosphorus on Indian lands, which all of those had expired by the time of the events at issue here. Okay. Any other contractual relationships? I don't believe so, Your Honor. I mean, those were in the context of the commercial operation of the plant. In this case, it deals only with their— Were there any contractual relationships with respect to the operation of the plant or the storage of the waste? No. No. And I think this Court had a decision several years ago, which involved employment relationships in the tribe's effort to regulate employment. And there were the sorts of consensual commercial relationships there, the leases and other contracts, and they're discussed in that Court's opinion. But none of those agreements were in place during the events at issue here. And the events at issue here deal exclusively with the waste on the land after the plant has been dismantled. So the EPA at some point comes in and says there's a problem with the storage of spent phosphorus tailings or whatever. Right. And the result of that regulatory process, as you describe it, results in an arrangement whereby the tribe will be paid some funds. Is that correct? The tribe could be reimbursed funds for monitoring in connection with the consent decree. So as a result of that relationship, some funds came from your plant and went to the Shoshone. Pursuant to federal law, Your Honor, not pursuant to any tribal regulation that FMC ‑‑ That's not in my question. Okay. Sorry, Your Honor. I can just frame it the best way I know how. Yes. And that went on for a period of time. Well, maybe I can ‑‑ Did it go on for a period of time? Is there a yes or no in your vocabulary? Yes. It did go on for a time. But if I could describe the relationship as I understand it. We'll get to that in a minute. Okay. It went on for a time, and at some point in time, looks like around the time your client shut down active operations of the plant, it stopped making the payments, however they arose. Your Honor, yes. But I think we're talking about two different payments, or at least we are in my mind. They're the payments at issue in this case, the $1.5 million annual fee. FMC did not pay those pursuant to the consent decree. They were not required by federal law. That's the subject of this dispute. The payments that I referred to earlier were simply in connection with the RCRA consent decree approved by this court. The tribe is reimbursed for any appropriate expenses there, but not pursuant to any agreement at issue in this case. It's separate. Your contention in this case is that the tribal courts had no jurisdiction over these matters. Yes, Your Honor. Who did? Well, EPA fundamentally had jurisdiction to regulate the wasted issue here. So did the state. And that's one reason why EPA. The tribe couldn't have come to district court? The tribe attempted to come and enforce the consent decree. In the decision upheld by this court, the court held that the tribe was not a party to that decree, was not a third-party beneficiary to that decree, and could not enforce that decree. The tribe was a part of the discussions that resulted in the consent decree. And to be clear, the tribe all along has opposed leaving the waste that was disposed on FMC's land and has sought a different remedy. But EPA, the world's foremost environmental expert, looked at this, concluded that the appropriate remediation was to leave the waste on site and to treat it extensively, as FMC has done. This court upheld that plan in a decision in which the court found that it was protective of human health and the environment. And that finding, which no one has asked this court to consider. Protective of human health and environment given the circumstances. That is to say, it was the judgment that it was safer to leave it there than to move it. It was the court found that it was protective of human health and the environment. And look, this case, one doesn't have to speculate here. This case, the waste has been on FMC's site for 70 years, and yet there's no measurable proof of any measurable harm to human health or the environment. And the tribes bear a formidable burden, which is how this court described it in the Evans case, to come forward with proof of an existential threat. That's under the second exception that I'll get to in a minute. Let's talk about the first exception, which is where Judge Wendell really rested most of his decision, which he says, well, you entered into a voluntary agreement. You entered into a contract. You consented. Your argument is you were coerced. Right. Well, but the tribe didn't do the coercing. The EPA did the coercing. I mean, you weren't a fix. I get that. In order for the EPA to move forward with the consent decree that you wanted, the EPA said you need the permission of the tribe. The tribe wasn't doing the regulating. The tribe was taking advantage of the situation that you were in put by the EPA. So why is that not a valid consent? With respect, I would disagree with that. The district court found that the consent decree required FMC to get permits from the tribe. But that is incorrect as a matter of law. All the consent decree provided, and this was in paragraph 8 of the decree, was that FMC would require any ‑‑ would obtain any permits that were actually required. Well, if you weren't required, why in the world did you sign that contract? To seek to work with the tribes through a collaborative relationship. It sounds as though you weren't coerced. Well, Your Honor, we were not claiming that this is a matter of duress. But the question is whether or not ‑‑ Because I read your brief. I'm sure that's what it sounds like. Well, we specifically say it wasn't a matter of duress, Your Honor. What we're saying is that this is not the kind of consensual commercial relationship that the Supreme Court has described in the Montana case. And the reason why is because when a regulator comes to you and says you need to agree to these permits, it's a fundamentally different situation than a nonmember deciding to go onto the reservation or Indian property and to avail himself of benefits such as doing business with the tribe. What would have happened if your client had refused the EPA's demands? Your Honor, the EPA made no ‑‑ Your Honor, just to be clear, the EPA never demanded that we get permits from the tribe. What did they demand? The EPA expects compliance with the consent decree. The EPA did not take a position on whether or not we were required to get permits. I'm talking about before the consent decree. The EPA begins an enforcement action, correct? Sure. And it's aimed at your client? Yes. And that was the product of the consent decree. This Court held that there was a diligent assertion of RCRA claims, that there was a reasonable settlement that was reached, and that the settlement that was reached to cap the ponds, leave the waste on site was protective of human health and the environment. The United States made clear in that case that the tribe's arguments that the consent decree required FMC to get a permit were wrong, that the consent decree didn't enlarge or expand the jurisdiction of the tribes. And so EPA, federal law, did not require us to get the permits at issue here. So the permits were a matter of volunteer by your client? You volunteered to make those payments? We did make the payments. How was the amount for the payments arrived at? Your Honor, what we agreed to, and we can ‑‑ let's talk about ‑‑ Agreed with whom? The tribe, and this is ‑‑ they pointed to, the Tribal Court of Appeals pointed to the August 11, 1997 letter. Take the Tribal Court of Appeals out of this. Okay. Your client agreed to obtain these permits and make payments, correct? They agreed to do it. This is the most that we agreed to, Your Honor. We agreed to make payments for the disposal of waste under the then current guidelines. And that's clear in the August 11 letter, 1997 letter. It's clear in other correspondence. When we stopped disposing the waste, and disposal is defined in the guidelines and effectiveness of time, and distinguished from storage. When we stopped disposing the waste, when we closed the plant, we stopped making the payments. And I want to be clear, too, that under the Supreme Court's Montana framework, even if the court thought that we consented to something, that we agreed to something, that's not the end of the analysis under Montana I. The Supreme Court made clear in the Plains Commerce case at page 337 that even then the tribe has to come forward and show that the regulation is necessary for tribal self-government or internal relations, and the tribe can't make that showing here, fundamentally for the same reason that the tribe couldn't make it in the Montana case. In the Montana case, the court held that the tribe couldn't make that showing because the fact was you've got a couple of things going here, and I want to sort them out. One of them is you're construing the agreement to say that your obligation to make the payment ceases when the plant ceases operation, and that's a question of what did you agree to. Assuming that the contract or the agreement is as Judge Windmill viewed it, that's not right. That is to say you have an obligation after the plant closes. That's one question. The other question is whether or not it's an agreement that can be enforced, and which is, I think, actually the more difficult or important question for you. I mean, because that, as you very carefully are pointing out, that's going to last a long time. But I have trouble. I want to come back to what you said about you did this in order to have a cooperative relationship with the tribe that you weren't coerced. Is that what you mean to say? Well, Your Honor, at the time that we made these agreements.  Sort of is the best I can answer it. What do you mean to say? What I mean to say is that this so-called agreement was reached through a regulatory process in which at one point the tribe. The tribe was not doing the regulating. It was EPA was doing the regulating. You came to the tribe, and then you and the tribe agreed to something. With respect, I would disagree with that. Okay. So it seems to me that's exactly what happened. You and the tribe came to an agreement, right? We did. But the EPA, I think, is not a part of this equation because it's tribe's assertion. Okay. So you came totally voluntarily. And then you made an agreement. We tried to reach an agreement, but we also did under — at one point the tribe said that they were going to impose us $182 million a year in fees that they were going to sue us. And so we tried to work this out because we had an impending practical need to dispose of waste. So that was part of the equation, too. But the broader problem with the tribe's position, Your Honor, to go to your point about whether or not this — whatever it is that anyone thinks was agreed to cannot be established jurisdiction under Montana I, is that that agreement was produced through a regulatory relationship, the assertion of regulatory power, and that's fundamentally different. Regulation by whom now? You keep saying — The tribe. The tribe. It was their permit that they were seeking to enforce. They were exercising — And you agreed to it. If you believe that, Your Honor — Well, you did agree to it. You signed it. No, no. We agreed to pay $1.5 million as a disposal fee while the waste was being disposed. Your client agreed to pay, but it wasn't an agreement. Your Honor, if you think that we agreed to — No, you just said that. You just said we agreed to pay. My client agreed to pay. And my question is, but it wasn't an agreement. It did not — here's my answer, Your Honor. One, it didn't — even if you think that we agreed to that, that we agreed to pay — You just told me you did. Then, Your Honor — But your client did. My broader point is that that agreement cannot be in established jurisdiction under Montana I because it is not the kind of consensual commercial relationship that the court has held as required. Because of the regulatory overlay. Because it was produced through a regulatory overlay. Number two, even if you think that agreement, even if you conclude that there was expressed consent there, you still have to make the separate inquiry as to — the tribes have to show that that regulation was necessary to the preservation of tribal self-government, and they can't do that because the EPA is here regulating the heck out of that property, out of that waste, in a plan approved by this court for remediating the waste. And the same thing happened in Montana case. Page 564, note 13, the court noted that the tribes in that case couldn't show that the regulation of hunting and fishing on fee lands was necessary because the state of Montana had always regulated that lands. And the same exact thing applies here. The tribes can't show that this regulation, even if you conclude that there was consent, was not necessary to the preservation of self-government because EPA is regulating that in a — pursuant to a plan that this court has approved and has held as to be protective of human health. If I could make one point on the due process issue, because I do think it's important, even if the court believes that there is jurisdiction, the court should not enforce a judgment because of the fundamental flaws in the process that we received. And that was indicative in several things. One, during — while this case was pending before the Tribal Court of Appeals, two of the three members of the Tribal Court of Appeals made shocking comments that revealed a bias, not an impartiality, in terms of how they were looking at this case and the jurisdictional issues. They referred to the Supreme Court's Montana decision as murderous to the Indian tribes. They said it was their duty to take a case and mold it to help a tribe. If any member of this court made those sorts of comments, that would be shocking. And everybody would presume that they wouldn't. Those members were replaced because I think the tribe itself realized the problem with those comments. But they — but the new panel never independently reassessed whether there was jurisdiction under Montana 1. The best that they can point to is ER 115. And there, all the new panel did was recognize the previous ruling under Montana 1. We asked — They recognized the previous ruling and said we're not taking any new evidence on the point. They did, which is even worse, because they didn't even independently consider it. They just said — Well, no, not necessarily. Meaning, as I read that, one of the ways to construe that possibility is, listen, we got the record, we don't need any new evidence, we're not going to interfere with it. They looked at it. Well, that just underscores that they never independently analyzed it, Your Honor. What that says is it was previously ruled that there was Montana 1. That was it. They never independently considered it. The second point is that we were denied an opportunity to appeal the Montana 2 ruling because the tribal court itself took the unusual position of taking evidence itself as a tribal court, as a court of appeals, as if, you know, you could be unthinkable that this court of appeals would take evidence itself in the matter of first instance. But by doing that, it deprived us of an opportunity to appeal. There were one-sided rulings where they allowed the tribe to put in as much evidence as they would like on Montana 2, but denied us an opportunity to put in additional evidence on Montana 1. And there's the overarching fact that the tribal courts are politically subservient to the business council. If you look at the factors that this court applied in the Byrd decision to find that there was a denial of due process there because of remarks by an attorney, I think you have to conclude that we were denied the fundamental minimum requirements of due process in this proceeding, and that's an independent reason why this judgment should not be enforced. Other than this appeal, and especially early on, did you ever go to district court and ask them to stop the tribal proceedings? Your Honor, we went to the tribes because the district court ordered us to go there to exhaust our jurisdictional arguments. So that's why we were in tribal court. We were there essentially in compulsion. The district court said we had to go there to exhaust our remedies. We were objecting to that jurisdiction all along. I understand. Thank you, Your Honor. You've used all your time, but we will give you a chance to respond. Thank you very much. May it please the Court. My name is Douglas Anderson. I represent the Shoshone-Bannock tribes. Also present in the courtroom today is Tribal Chairman Nathan Small. The facts in this case have no parallel in any of the Montana case law. FMC is storing a staggering quantity of toxic waste on land that sits above the Portneuf River and the Fort Hall Bottoms that have long been relied on by tribal members for subsistence and cultural purposes, including the Sundance. In 1998, FMC agreed to pay the tribes $1.5 million per year for the right to store the waste on the reservation and the right to be exempt from tribal waste permitting regulations. It has paid nothing since 2001. My argument will address the voluntariness of the agreement, the duration of the agreement, the second Montana exception threat that's present here, and then due process. Let me say first on voluntariness. FMC argues that a consensual relationship can't be formed if regulatory authority is asserted first, but that's really the norm in jurisdictional cases. The tribe asserts jurisdiction, as in Williams versus Lee establishing a tribal court, as in Morris, Buster, Colville, the cases that the Supreme Court cites to illustrate the first exception, where a tax was enacted, and then the consensual relationship is formed. So that's the norm. There's nothing irregular about it, and there's nothing wrong about that order under this circuit's water wheel test for determining the existence of a consensual relationship. It turns on whether the non-Indian should have reasonably anticipated that his interactions with the tribe would trigger tribal jurisdiction. And that understanding, that reasonable anticipation, is certainly aided when the tribe first asserts regulatory authority. Finally, the permissibility of a consensual relationship being formed after an assertion of regulatory authority is really a matter of settled law. The 1990 FMC case, that's really what happened. The tribe passed a tribal employment rights ordinance. FMC objected. The parties negotiated an agreement to implement the ordinance's goals. FMC didn't comply with it, and the tribes then brought suit. And this court upheld that tribal jurisdiction under the first exception based on the agreement that had been negotiated after the ordinance was passed. The same facts are present here. And I should add that, you know, much of the waste that is now stored on the property was actually mined under the same leases that were before this court in FMC1, as was shown by the testimony at trial. Second, the agreement that FMC negotiated was voluntary. It complains that the tribes had earlier proposed a higher fee and that it had no better alternative than to reach agreement, but the higher fee that FMC refers to was never adopted, much less imposed on FMC. And FMC later negotiated the 1998 agreement, under which it pays less than seven cents per ton per year to store waste. When FMC commented on the earlier proposal, it said Idaho imposes a $30 per ton fee on the disposal of hazardous waste at commercial facilities. Well, the tribes would have to impose their fee for 440 years before it would equal Idaho's one-time disposal fee. It's also the case that FMC's agreement was voluntary, as the district court held in ruling that this was a simple business deal, not the product of illegal duress or coercion. FMC had painted itself into a corner. It had used the reservation as a dump site for over 50 years. It had failed to comply with RCRA, and the United States was seeking to enforce it against it. EPA was willing to work with FMC and reach agreement, but said, as the district court held, go and get permits. And FMC agreed to do so. It chose to negotiate rather than say no to EPA, we won't get travel permits, rather than litigate, as it had done in the 1990 case. And that was an exercise of its free will. It wanted to get out of the problem that it had put itself in. Second, the district court correctly held that FMC agreed to pay the fee as long as it stores waste on the reservation, in exchange for an exemption from tribal waste permitting regulations. The tribal appellate court had earlier so held, and that ruling was reaffirmed by the second panel. The determinations made by the tribal courts were made in the exercise of the jurisdiction to which FMC had consented, and were not clearly erroneous. By way of background, the 1998 agreement was negotiated at the same time that FMC was negotiating the RCRA consent decree with the United States. And in those discussions, FMC, the United States, and the tribes were all aware that FMC would be required to permanently close the RCRA ponds. The discussion in the record on this is at ER 856 and 857. So FMC knew at that time that that waste would be remaining on the reservation. It then negotiated the 1998 agreement, which shows that the parties intended that the agreement would cover all hazardous and non-hazardous waste activities on the property. The tribes first set out that understanding in saying that the fee would be imposed in lieu of the hazardous and non-hazardous waste fees imposed under tribal law, that it would be paid in 1998, 1999, and for every year thereafter. After initially seeking to limit the agreement to ponds 17 to 19, FMC's lead negotiator said on June 2nd, the agreement covers the plant and would be paid for the future even if the use of the ponds was discontinued. Does the agreement you're referring to contain any enforcement mechanism? The district court correctly held on that point that by entering into the agreement, FMC consented to tribal jurisdiction without a specific consent being required. And the waterwheel test of this circuit makes clear that by entering into the consensual relationship, the non-Indian has consented to tribal jurisdiction that has a nexus to the consensual relationship, which plainly exists here since they're basically one and the same. So your answer is no specific mechanism for enforcement in the agreement, but the district court, Judge Windmill, made specific findings on this point. Yes, he did, Your Honor. I would say also that he also found that FMC had not sought to reserve any objection in the 1998 agreement, did not sought to reserve any objection to jurisdiction. And that's notable because in early agreements, it had sought to do so. I should add that FMC, in letters to the tribe that were sent in conjunction with the 1998 agreement, did confirm that it had consented to tribal jurisdiction in the land use permitting area. This was a letter, again, from FMC's lead negotiator that we cite in our brief that confirmed that. And the understanding here was then also confirmed by the letters that FMC sent in 2000 and 2001, saying this payment covers all hazardous and non-hazardous waste activities on the reservation. Those activities are continuing. Closure and compliance activities are continuing on the site, as shown at SCR 122. The FMC was extracting phosphine from one of the ponds at the time of trial, and its obligations under the 1998 agreement are continuing. There is nothing improper about a non-Indian entering into an agreement with a tribe that remains in effect for as long as the activity it authorizes continues. Nor is there anything improper about a tribe agreeing to limit its exercise of sovereign authority to achieve that purpose. And that's what happened here. And that makes the cases on which FMC relies, where the parties didn't intend any minimum duration, that makes those cases inapplicable. Turning to the second exception, Your Honor, the district court correctly held that FMC's waste was not hazardous. It poses a catastrophic threat to tribal governance, cultural traditions, health and welfare, relying on the tribal appellate court's second Montana exception decision. Here, too, the district, the findings of fact on which the tribal court's ruling is based are not clearly erroneous. That ruling and the district court's ruling were correct for the following reasons. First, the waste present on the site is radioactive, carcinogenic, poisonous and massive in size. Phosphorus permeates the property. The groundwater is contaminated with phosphorus, arsenic and heavy metals. Millions of tons of slag contaminate the surface and the soils. Those contaminates sit above the Portneuf River and the Fort Hall bottoms, and their movement is subject to natural forces. What expenses might the tribe expect to incur in the future as a result of the storage of the waste on the FMC site? Any? Yes, Your Honor. At the time the 1998 agreement was negotiated, the tribe was just getting its permitting program, or rather its regulatory program, in place, and FMC agreed to pay a $1 million startup fee for that to occur, and then paid the fee for four years. The record shows that during that time, the tribes, through tribal agencies charged with that responsibility, engaged in sampling activities, quality control assurance, oversight of both the RCRA and CERCLA sites, document review, interaction with regulatory authorities, and the record also shows that the funds that the tribe received were inadequate to support those activities. And at the time that this fee was negotiated, the RCRA consent decree set out a menu of rights that the tribe could use to be sure it couldn't enforce them directly itself, but it set out a number of monitoring, inspection, and oversight rights that the tribe had, so the parties knew when they negotiated what the tribes would be able to do under the RCRA consent decree, and the tribes were doing everything they could, but they simply didn't have the funds. Now, for the future, Your Honor, I think that there's a great deal that needs to be done concerning monitoring for phosphine. There wasn't a plan included in EPA's IRODA that said it would develop one later. Further study of what to do about 21 tanker rail cars that FMC simply buried on the property with phosphorus inside, and those cars are corroding, as the district court noted. There is the contamination... Pat, is there any lining? I mean, what are we dealing with, corrosion and seepage? What do we know scientifically about this site? There's not a great deal known about the rail cars, except that FMC dumped them in a hole and covered them with clay and slag. They were not designed for disposal of phosphorus or other materials. They were simply tanker rail cars that FMC deemed too dangerous to clean out, so they just dumped them and sent them down into the hole. So there is no protection for them, and EPA decided that it would simply leave those rail cars where they were. So one of the uncertainties is the point at which those rail cars will begin to leak, and the phosphorus that contaminates the property already, literally, will begin to leak. It permeates it, flows through with the groundwater directly into the Portneuf River and Fort Hall Bottoms, so there is a continuing conduit for this contamination to flow, and EPA can't control the downhill flow of groundwater, can't stop that from happening. EPA can't control the process by which phosphorus converts to phosphine when exposed to water or moisture, it can't stop phosphorus from burning or exploding when exposed to air. All of these exposures, transports, releases of contaminants will continue. Now, EPA, at the time of trial, their remedy had not been implemented, so it hadn't reduced the threat one iota, and the district court noted that, pointing to their 2013 unilateral administrative order. In addition, I would say that this court's decision in Montana v. U.S. EPA makes clear that a tribe is not required to rely exclusively on EPA to protect its treaty rights and its natural resources, and here that's particularly with good reason. The RCRA consent decree applies to only portions of the property. The IRODA, as we refer to it, the interim remedy, and it's only that, a final remedy the district court found won't be available for five or ten years, had not been implemented at that time, and as I said, even when it is implemented, the threat will not be arrested because the threat comes from natural forces and chemical reactions, that EPA really can't do anything about. So what do we have in the record with respect to two different kinds of expenses that the tribe might incur? Number one, from here forward, I understand that it might have been different during earlier stages, but from here forward, continuing monitoring expenses or ongoing sort of protections that the tribe is going to be doing, that's one thing. In a non-catastrophic situation, but money that might, second, money that might have to be set aside in the event of some catastrophic leak, or I'm not quite sure even how to say it, some serious event that's beyond simply monitoring. What kinds of expenses are there in the record that the tribe might anticipate? What kinds, if any? I think first there's the monitoring and oversight of the contamination, which has been ongoing, for which there's not adequate funding. That's in the record that we have? Yes, that's in the record that the funding that the tribe was receiving was inadequate and unreliable. Do we have any numbers now as to the monitoring, in a broad category, expenses that the tribe may anticipate? Not a budgeted figure. One of the problems the tribe was facing was it was seeking to regulate these activities and got start-up money from FMC to do it, and only received that money for four years. I think that had FMC suggested that the $1.5 million was, in any respect, unreasonable, then the district court would have had occasion to address the issue of whether the fee was or wasn't reasonable. It carried over the fee because FMC had agreed to it, and it reaffirmed that ruling in the order of May 28. So when it carried it over, it was entirely proper to do so, and FMC didn't state any objection. What do I do with Judge Windmill's conclusion that with respect to the second Montana exception, that is to say basically the protection against threats to health and safety of the tribe, he says he doesn't find enough in there to connect the $1.5 million to exception two. What do I do with that? Yeah, I think it was connected by the parties' informed, represented parties sitting down and negotiating what that amount would be, at the same time that the United States was undertaking to regulate under RCRA, the tribes were undertaking to regulate under tribal law. So these well-informed, well-represented parties negotiated an agreement, and the benchmark to which EPA or FMC looked was the state of Idaho's $30 per ton fee. Sounds as though you gave them a deal. Remarkable things here is, you know, FMC, while it protests that it was duress or coercion, negotiated a very good deal for itself, less than $0.07 per ton. The tribes have never had a chance to determine what they would do with the money they never got, and they haven't had a chance to budget it, but if you look at the Idaho, state of Idaho fees, you see that the tribe's fee is very, very reasonable to deal with $0.22 per ton. That's 2 million tons of waste that has already contaminated 20 percent of the reservation roads are contaminated with slag, which FMC used to sell. The Portneuf River and the Fort Hall Bottoms are contaminated with phosphorus and arsenic. The River Delta is contaminated. The use of these lands for ceremonial and cultural purposes has been arrested by virtue of that contamination, as tribal members testified. Well, you know, you're at the end of your time, so if you would emphasize on briefly. The order of May 28 addressed the only question that FMC asked the court to consider, namely, has the court made all the factual determinations necessary to the decision it issued? That's the only thing that FMC asked the court to do, but in the order of May 28, FMC's attack on that ruling is really an attack on the integrity of the panel and the district court. The district court anticipated that and expressly determined that the members of the new panel were not biased in favor of the tribes or against FMC. They were all well-respected members of the Idaho Bar. Thank you very much. Thank you, Your Honors. Just briefly on the justification for the fees, the tribes have not come forward with any actual justification in terms of expenditures for the $1.5 million fee. The money they haven't been getting for quite a long time, right? Well, we haven't paid it since 2001, Your Honor. The only thing that they point to is generalized statements at pages 44 to 46 of their brief. We respond to that at pages 36 to 38 of our reply brief. On Montana 1, I'd point the court to what the tribe itself said in Mr. Galloway's declaration, FER6, paragraph 7, where it said that FMC conceded jurisdiction to the commission in the limited area of land use permitting over the ponds under the commission's guidelines in place before August 11, 1997. That was it. Now, Montana 1 argument we heard today here is an in-for-a-penny, in-for-the-pound argument that the court has rejected. On Montana 2, all of their arguments about the dangers posed by the waste in the abstract, to find that that presents an existential threat to the tribe under the Evans analysis and Plains Commerce analysis, the court would have to disagree with the EPA and this court itself that the remediation plan that EPA has devised is protective of human rights. And on this, what the district court said was that FMC's evidence established without rebuttal that despite the toxicity of the waste, no measurable harm had yet occurred to humans or water quality, and EPA's containment program would prevent any future harm. That's ER20. And then lastly, on due process, we did ask them to vacate the prior ruling, reconsider it, AR6553, ER74-41. And we did ask the court to reverse the judgment below, find that this extraordinary judgment imposing on the district court is not a summary judgment ruling, it would not be entitled to the ordinary deference that would apply to an actual finding of fact. And finally, we did ask the court to reverse the judgment below, find that this extraordinary judgment imposing on the district court is not a summary judgment ruling, it would not be entitled to the ordinary deference that would apply to an actual finding of fact. Thank you very much.
judges: Hawkins, W. Fletcher, Bury